UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| GALEN AKERSON and <br> JOYCE T. AKERSON, <br>       Plaintiffs, <br><br> v. <br><br> FALCON TRANSPORT COMPANY, <br>       Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> )    CV-06-36-B-W <br> ) <br> ) <br> ) <br> ) |

**ORDER ON MOTION TO EXCLUDE EXPERT TESTIMONY
AND MOTION FOR SUMMARY JUDGMENT**

The Court concludes that a physician's assistant is qualified under Federal Rule of Evidence 702 to express expert opinions within the limits of his training and education as to the cause and treatment of a cervical strain. It also concludes that an emergency room physician and a physician's assistant have a proper foundation upon which to base their expert opinions and that their opinions meet *Daubert*[1] requirements. Because the Defendant's motion for summary judgment is premised on the success of its motion to exclude the Plaintiffs' experts, the Court denies the Defendant's dispositive motion.

**I. STATEMENT OF FACTS**

    **A. The Accident**

At about 8:30 p.m. on Friday, April 16, 2004, Galen Akerson, then a 69 year old resident of Stockholm, Maine, was sitting in his underwear at the edge of the lower bed of his Freightliner tractor-trailer with the curtains drawn around him eating fried chicken and drinking soda at the Pilot Truck Stop in Marengo, Ohio, when a Falcon Transport Company (Falcon)

---

[1] *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993).

flatbed tractor-trailer collided with his trailer. *Pls.' Additional Statement of Material Fact* (PASMF) ¶¶ 1, 5, 6, 8.[2] Mr. Akerson had no idea there was going to be an impact. *Id.* ¶ 11. His tractor-trailer sustained an "awful hit" and his "stuff went flying." *Id.* ¶ 9. Mr. Akerson opened the curtain on the driver's side and saw that the center of the flatbed had driven into the back of his trailer. *Id.* ¶ 14. He then heard a pounding on his passenger side door and got dressed to respond. *Id.* ¶¶ 15, 16.

It was Gary Davis, the operator of the Falcon flatbed, knocking on the door. *Id.* ¶¶ 15, 17. Mr. Davis had been hauling a load of steel pipes and, after fueling up at the Pilot Truck Stop, had cut a right turn too short when his flatbed struck Mr. Akerson's vehicle. *Id.* ¶¶ 19, 20. Mr. Davis's flatbed was in second gear and he estimated that he struck Mr. Akerson's vehicle at no more than ten miles per hour. *Id.* ¶ 21. The impact caused damage to the left rear corner of Mr. Akerson's trailer, bending the heavy metal of the corner, breaking the light fixture, tearing the bottom hinge of the door, and bending the bottom of the door. *Id.* ¶ 23. The Falcon flatbed was also damaged. The impact tore a bracket that holds a stake off the side of the Falcon flatbed and cut through the four-inch nylon strap used to fasten the steel pipes. *Id.* ¶ 26. The flatbed was wedged into the corner of Mr. Akerson's trailer and could not be moved forward. *Id.* ¶ 27. Mr. Davis had to back up the flatbed to free it. *Id.*

### B. Symptoms and Treatment

Mr. Akerson was awakened by pain at 4:00 a.m. on Saturday, April 17, 2004. *Id.* ¶ 28. He drove to Maine in "great pain," finally arriving home the evening of Monday, April 19, 2004.

---

[2] Under Local Rule 56, a party "replying to the opposition to a motion for summary judgment shall submit with its reply a separate, short, and concise statement of material facts which shall be limited to any additional facts submitted by the opposing party. The reply statement shall admit, deny or qualify such additional facts…." Local Rule 56(d). The failure to properly controvert a statement of material fact results in the statements being "deemed admitted." Local Rule 56(f). Here, although Defendant replied to the Plaintiffs' legal memorandum, it did not respond to Plaintiffs' Opposing Statement of Material Facts and the facts are, therefore, deemed admitted. *See Robinson v. Wright*, No. CV-05-190-B-W, 2006 U.S. Dist. LEXIS 78671, at *12 (D. Me. October 27, 2006).

*Id.* ¶ 30. By the time he arrived home, his pain was "terrible," coming from behind his left ear and running down into his neck, left shoulder and arm. *Id.* ¶ 32. After Mr. Akerson returned home, he first sought medical care on April 21, 2004 at Cary Medical Center, where he was seen by Dr. Daniel Harrigan. Mr. Akerson told Dr. Harrigan that he was seated in the sleeper part of the truck when he was hit on the rear driver's side. *Id.* ¶ 78. He had no complaints of pain at the time, but developed left sided neck pain over the ensuing days. *Id.* He presented at the emergency room with complaints of left sided neck pain that was worse when he lay down and that radiated to his left shoulder, but not anywhere else. *Id.* Mr. Akerson described his pain as a ten on a zero-to-ten pain scale. *Id.* ¶ 79.

Dr. Harrigan examined Mr. Akerson by palpating his neck, evaluating his range of motion, and assessing the motor and sensory reflexes of his upper extremities. *Id.* ¶ 80. He found Mr. Akerson's sensory and motor arm function to be normal, but noted limited flexion, extension, and left lateral rotation. *Id.* ¶¶ 81, 88. The doctor ordered three-view x-rays of Mr. Akerson's neck, which demonstrated less arthritis than the doctor expected. *Id.* ¶ 83. The radiology report characterized the degree of arthritis as "minimal degenerative change." *Id.* ¶ 84. Dr. Harrigan diagnosed a "cervical radiculopathy on the left." *Id.* ¶ 85. He could not entirely rule out disc problems. *Id.* He also thought Mr. Akerson had sustained a muscular injury, which was generally consistent with the delay in the onset of Mr. Akerson's symptoms. *Id.* ¶¶ 86, 87.

Mr. Akerson's employer, Morris Farms, sent him to Lynn Briggs, P.A., who first saw him for injuries related to the accident on April 27, 2004. *Def.'s Statement of Material Fact* ¶ 1 (DSMF); *Pls.' Opp'n to Def.'s Statement of Material Fact* ¶ 1 (PODSMF). Mr. Briggs has been qualified to perform Department of Transportation ("DOT") evaluations to determine whether truck drivers are medically qualified in accordance with Federal Motor Carrier Safety

Regulations. *PASMF* ¶ 44.  One significant aspect of a DOT examination is to evaluate cervical rotation, because a truck driver must be able to flex his neck to view the mirrors of his truck.  *Id.* ¶ 52.  If a truck driver has significantly limited cervical rotation, he will not be able to operate a truck.  *Id.*

In his capacity as a physician's assistant, Mr. Briggs had performed DOT examinations for Mr. Akerson every two years since 1995, the last examination being on May 22, 2003.  *Id.* ¶ 46.  At his first examination of Mr. Akerson on March 20, 1995, Mr. Briggs documented a history of a motorcycle accident in 1977 which had resulted in a nearly complete amputation of Mr. Akerson's foot, requiring surgical re-attachment.  *Id.* ¶ 74.  He also noted several years of increasing deformity (contractures) in two fingers on the right hand and one finger on the left hand and arthritis in his back.  *Id.*  When Mr. Briggs examined Mr. Akerson in 1999, he found some decreased right rotation of his cervical spine, approximately 40 degrees to the right.  *Id.* ¶¶ 50, 51.  This limitation of motion did not, however, restrict his ability to drive.  *Id.* ¶ 51.  At his 2001 DOT physical, Mr. Akerson told Mr. Briggs that he had considered retiring at age 65, but had decided to continue driving because he enjoyed it.  *Id.* ¶ 75.

When Mr. Akerson saw Mr. Briggs on April 27, 2004, he told him that he did not have any pain, discomfort or other problems during the evening of the accident, but on awakening the next morning, his neck was extremely stiff and painful on the left side.  *Id.* ¶ 57.  He was able to drive his truck home to Maine over the next couple of days, but the pain continued to get worse and he ultimately went to the emergency room on April 21, 2004.  *Id.*  Mr. Briggs was aware at the time of this examination that the x-rays at the emergency room had shown minimal degenerative disease and nothing else.  *Id.* ¶ 56.  Although he did not take actual measurements, Mr. Briggs did a range of motion assessment of Mr. Akerson's cervical spine and took him out

4

of work, because he did not believe Mr. Akerson was safe to drive. *Id.* ¶ 53. Mr. Briggs' examination of Mr. Akerson on April 27, 2004 included direct palpation of the cervical spine and he found that the muscle on the left gave more resistance than the muscle on the right. *Id.* ¶ 55. Mr. Briggs recommended physical therapy and refilled a prescription for pain medication that had originally been issued at the emergency room and refilled a prescription for a muscle relaxant. *Id.* ¶ 63.

Mr. Briggs next saw Mr. Akerson on June 16, 2004. *Id.* ¶ 64. He was still having quite a bit of discomfort on a regular basis, including difficulty moving his neck and experiencing radiating pain into his arm. *Id.* After discussing the case with the physical therapist, Mr. Briggs recommended that Mr. Akerson undergo chiropractic treatment. *Id.* ¶¶ 65, 66. He maintained Mr. Akerson's work restriction, because of his continued restricted range of cervical motion. *Id.* ¶ 67. The chiropractic treatment was ineffective, because Mr. Akerson was reluctant to be manipulated. *Id.* ¶ 68. Mr. Briggs last saw Mr. Akerson on December 15, 2004. *Id.* ¶ 72.

## II. DISCUSSION

Falcon has filed two motions in this case: 1) a motion to preclude the testimony of Dr. Harrigan and Mr. Briggs regarding causation; and, 2) a motion for summary judgment.[3] The motions are interrelated because the motion for summary judgment is premised on the

---

[3] It is unclear whether Falcon is asserting that the Plaintiffs committed a discovery violation in failing to comply with the disclosure requirements of Rule 26(a)(2)(B). Falcon asserts in its introduction that the Plaintiffs failed to designate an expert on the issue of causation and that the Plaintiffs designated Dr. Harrigan and Mr. Briggs "only to address diagnosis and treatment." *Def.'s Mot. to Preclude* at 2 (Docket # 11). But, Falcon does not otherwise address the disclosure issue in its memorandum. In their Rule 26(b)(1) expert disclosures, the Plaintiffs list both Dr. Harrigan and Mr. Briggs and state only that they will testify about "[i]njuries suffered by Galen Akerson; Treatment provided." (Docket # 12 Attach. 2). The Plaintiffs apparently also attached medical records. The Court agrees with Falcon that the Plaintiffs' Rule 26(a)(1) disclosures are terse to a fault and fail to comply with the Rule and the Scheduling Order. However, Falcon deposed each expert and thoroughly questioned both Dr. Harrigan and Mr. Briggs as to the scope and bases for their opinions, including causation. There is no showing that Falcon suffered any harm from the Plaintiffs' failure to comply with the Rule and Order.

assumption that the motion to preclude expert testimony will be granted, leaving the Plaintiffs without expert testimony on causation, which Falcon contends is required under Ohio law.[4]

### A. The Expert Qualifications of Mr. Briggs

Falcon's first salvo is directed solely to Lynn Briggs, the physician's assistant. Relying on the court's gate-keeping function as set forth in *Daubert*, Falcon asserts that Mr. Briggs, as a physician's assistant, is not sufficiently educated and trained to express medical causation opinions. *See Daubert*, 509 U.S. at 589.

#### 1. Mr. Briggs' Training and Experience

Lynn Briggs received his first medical training in the military, beginning with two months of medical corpsman training at Fort Sam Houston, Texas in 1970. *PASMF* ¶ 35. He received an additional one-year training course as a Clinical Specialist in Denver, Colorado and after re-enlisting, he entered into a formal physician's assistant training program. *Id*. ¶¶ 36, 37. He underwent one year of didactic training at Fort Sam Houston and one year clinical training at Fort Riley, Kansas. *Id*. ¶ 37. He then took a flight surgeon's course and worked as an aviation medicine physician's assistant at Fort Riley for two years. *Id*. ¶ 38. He applied and was selected for a specialty training program in occupational medicine and spent twenty-one months in an occupational medicine residency at the University of Oklahoma. *Id*. ¶ 39. After serving as the physician's assistant representative to the forces command at Fort McPherson, Georgia for two years, he retired from the military and moved to Maine. *Briggs Dep.* at 18.

Since the mid-1990s, he has been engaged in the practice of occupational medicine through Pines Health Services in Caribou, Maine. *PASMF*. ¶ 40. In his practice, Mr. Briggs is periodically called upon to express opinions on whether the injuries he treats are work-related.

---

[4] Because the Court declines to exclude the Plaintiffs' expert testimony, the Court does not reach the question of whether Ohio law allows a plaintiff to proceed in a whiplash case without expert testimony on causation.

*Id*. ¶ 42. He is specifically authorized by Maine law to complete M-1 Practitioner's Reports, expressing his professional view on whether injuries are work-related. *Id*. ¶ 43. When he does so, he is not required to have his opinion countersigned by a physician. *Id*. He is also authorized to perform physicals for truck drivers for DOT certification. *Id*. ¶ 44.

In his practice, he has examined and treated on a yearly basis approximately five to six extension/flexion cervical (whiplash) injuries that are more than simple strains. *Briggs Dep*. at 20-21. Although he has not had any courses directly related to injuries resulting from motor vehicle accidents, he has had training in the mechanism of these injuries and his prior training and work as a physician's assistant for a flight surgeon addressed similar concepts. *Briggs Dep*. at 20.

### 2. Federal Rule of Evidence 702

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. In *Santos v. Posadas De P.R. Assocs.*, the First Circuit noted that experts "come in various shapes and sizes" and there "is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." *Santos,* 452 F.3d 59, 63 (1st Cir. 2006) (citing *United States v. Hoffman*, 832 F.2d 1299, 1310 (1st Cir. 1987) (stating that "[e]xpertise is not necessarily synonymous with a string of academic degrees or multiple memberships in learned societies.")). On the other hand, a testifying expert "'should have achieved a meaningful threshold of expertise' in the given area." *Levin v. Dalva Bros.*, 459 F.3d

7

68, 78 (1st Cir. 2006) (quoting *Prado Alvarez v. R.J. Reynolds Tobacco Co., Inc.*, 405 F.3d 36, 40 (1st Cir. 2005)).

In *Hoffman*, for example, the First Circuit upheld the district court's determination that a veteran DEA agent could testify as an expert to clarify the coded conversations between two drug dealers.  Despite a lack of formal schooling or written texts in the cocaine trade, his twelve years experience in law enforcement, participation in hundreds of investigations, and specialized police training were sufficient to qualify the agent as an expert.  832 F.2d at 1310.  Since *Hoffman*, the First Circuit has repeatedly "permitted law enforcement officers, not formally trained as 'experts,' to furnish opinions based on their real-world experience." *United States v. Robinson*, 144 F.3d 104, 108 (1st Cir. 1998); *United States v. Valle*, 72 F.3d 210, 214-15 (1st Cir. 1995); *United States v. Rivera*, 68 F.3d 5, 8 (1st Cir. 1995); *United States v. Tejada*, 886 F.2d 483, 486 (1st Cir. 1989).

The test, as these cases demonstrate, is "whether, under the totality of the circumstances, the witness can be said to be qualified as an expert in a particular field through any one or more of the five bases enumerated in Rule 702 - - knowledge, skill, experience, training, or education." *Santos*, 452 F.3d at 64.  This test applies with equal force to the medical field.  In *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion Familiar*, 345 F.3d 15, 24-25 (1st Cir. 2003), the First Circuit rejected a challenge to the qualifications of a physician, who was a general practitioner, to testify about ectopic pregnancies.  *Gaydar* commented that a physician "need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline" and noted that the question was "whether the scientific, technical, or other specialized knowledge he offers will assist the trier better to understand a fact in issue." *Id.* at 24 (internal punctuation and citation omitted); *see also Mitchell v. United States*, 141 F.3d 8, 15-16

(1st Cir. 1998) (allowing internist with specialties in hematology and oncology to testify even though not a gastroenterologist).

Although there is no First Circuit case law addressing the application of these principles to physician extenders, such as physician's assistants, there is authority from other circuits allowing similar testimony.[5] *See United States v. Withorn*, 204 F.3d 790, 796 (8th Cir. 2000) (finding that the trial court properly allowed expert testimony from certified nurse midwife in a rape prosecution). Although state law does not control, courts in both Ohio, where the accident took place and where the Defendant is incorporated, and Maine, where the Plaintiffs reside, allow expert testimony from physician extenders. *See State v. Smith*, No. 03AP-1157, 2004 Ohio App. LEXIS 4316 (Ohio Ct. App. Sept. 9, 2004) (allowing nurse practitioner to testify concerning whether a patient's physical condition is consistent with a history of sexual abuse under Ohio Rule of Evidence 702); *In re Walter R.*, 2004 ME 77 ¶ 16, 850 A.2d 346, 351 (allowing a physician's assistant to fulfill the statutory "expert psychiatric testimony" requirement.); *State v. Tibbetts*, 572 A.2d 142, (Me. 1990) (allowing physician's assistant to testify in rape prosecution to results of pelvic examination).[6]

---

[5] The extension of Falcon's argument from the rarefied world of legal theory to the real world of medical practice is troubling. It has been widely reported that in certain areas of the Country, both urban and rural, there is a growing scarcity of physicians. Numerous people, through no fault of their own, simply do not have direct access to physicians and instead receive care from a variety of physician extenders, including nurse practitioners, physician's assistants, nurse anesthetists, and others. Physician extenders practice under the overall supervision of a licensed physician, but the responsible physician may not have direct contact with the patient and the evidentiary value of his testimony could be limited. If expert testimony of the physician is required to demonstrate causation, the patient who has had direct contact only with a physician extender could be placed at a significant disadvantage. Any causation opinion by the responsible physician could be attacked as lacking a sufficient foundation and any causation opinion by the physician extender could be challenged as lacking sufficient expertise, raising the possibility that some people would effectively be denied civil redress for personal injuries negligently caused by others. If this Country's medical system has sufficient confidence in the expertise of physician extenders to entrust the treatment of its citizens to them, this Country's legal system should have sufficient confidence to allow them to testify as experts to the extent of their expertise.

[6] Other states have allowed the testimony of physician's assistants within the area of the physician's assistant's expertise. *State v. Carlson*, 559 N.W.2d 802, 809 (N.D. 1997); *Jackson v. State*, 516 So. 2d 726, 749-50 (Ala. Crim App. 1985); *Wal-Mart v. Indus. Comm'n of Ariz.*, 901 P.2d 1175, 1177 (Ariz. Ct. App. 1995); *State v. Jones*, 367 S.E.2d 139, 146-47 (N.C. Ct. App. 1988).

Here, Mr. Briggs' knowledge, skill, experience, training, and education qualify him both to diagnose and to treat Mr. Akerson for his neck problems and, hence, to testify about the cause and treatment of his condition. Although there may be some highly specialized areas of medical care beyond his expertise as a physician's assistant, the record demonstrates that neither the causes nor the treatment of whiplash is one of those areas. Mr. Briggs' proposed testimony would assist the trier of fact to better understand the facts and readily satisfies the threshold requirements of Rule 702. Falcon is free to explore on cross-examination the limits of Mr. Briggs' expertise and to offer countervailing expert opinions, if available, from witnesses with equal or more extensive training. Under the standard jury instructions in this Circuit, the jury is instructed that it should weigh the relative expertise of the expert in evaluating how much weight to give the expert's testimony.[7] The Court will not exclude Mr. Briggs' expert opinions; rather, it is the function of the jury in this case to measure the convincing power of Mr. Briggs' expert opinions against the other evidence in this case and to arrive at a verdict.

### B. Foundational Objections to Causation Opinions

Falcon next challenges Dr. Harrigan's and Mr. Briggs' opinions linking Mr. Akerson's neck symptoms to the April 16, 2004 accident on the ground that neither has a sufficient factual foundation to express a causation opinion. Here, the medical providers had Mr. Akerson's own description of the initial trauma as well as his description of the onset and intensity of his symptoms, and each provider made findings on examination consistent with the history. Falcon's objection goes to weight, not to exclusion. "As a general rule, the factual basis of an

---

[7] The standard District of Maine expert testimony instruction reads:
"You have heard testimony from people described as experts. People who, by education and experience, have become expert in some field may state their opinion on matters in that field and may also state their reasons for the opinion. Expert opinion testimony should be judged like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case." Draft Civil Jury Instructions, *available at* http://www.med.uscourts.gov/practices/DBH%20Draft%20Civil%20Jury%20Instructions.pdf

expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir. 2005); *Brown v. Wal-Mart Stores, Inc.*, 402 F. Supp. 2d 303, 308 (D. Me. 2005). The Court has described the information available to each expert and concludes that it is sufficient to form the basis for an expert opinion. Any "flaws in [their] opinion[s] may be exposed through cross-examination or competing expert testimony." *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002).

### C. Objections to Scientific Reliability and Methodology

Falcon finally attacks the causation opinions of Dr. Harrigan and Mr. Briggs on the ground that they lack scientific reliability because neither medical provider demonstrated an acceptable scientific methodology as mandated by *Daubert*. Falcon categorizes the medical providers' opinions as akin to the impermissible use of concepts such as *post hoc ergo propter hoc* or *res ipsa loquitor* to establish causation. Falcon claims that the medical providers simply accepted Mr. Akerson's assertions that he was symptom-free before the accident and that the onset of symptoms began after the accident. In effect, they accuse the medical providers of placing a professional sheen on Mr. Akerson's uncorroborated complaints.

Falcon correctly asserts that the expert opinions of Dr. Harrigan and Mr. Briggs must not be based merely on the *ipse dixit* of the expert. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("…nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."). But, the application of this general principle to the facts in this case and the proposed expert opinions is attenuated. Although neither provider use the term "differential diagnosis," the medical records in this case establish that each followed the standard medical protocol to identify

11

the medical cause of Mr. Akerson's complaints. The First Circuit has stated that a differential diagnosis is a "standard scientific technique, widely used in medicine, of identifying a medical 'cause' by narrowing the more likely causes until the most likely culprit is isolated." *Baker v. Dalkon Shield Claimants Trust*, 156 F.3d 248, 252 (1st Cir. 1998).[8]

In *Feliciano-Hill v. Principi*, 439 F.3d 18 (1st Cir. 2006), the First Circuit firmly rejected a similar *Daubert* challenge. Based on his training and physical examination of the plaintiff, the physician in *Feliciano-Hill* had concluded that the plaintiff's medical condition prevented her from walking around the hospital. The First Circuit stated:

> …[T]he underlying medical question - - whether Dr. Feliciano-Hill's medical condition prevented her from walking around the hospital - - was "not a complex medical situation." [The doctor's] testimony and report did not involve novel medical theories. The doctor was called upon only to offer a routine diagnosis, on a patient he had examined, pertaining to a common condition well within his particular expertise. In this case, the doctor's training and experience placed his report and testimony well above the Rule 702/*Daubert* bar. Indeed, even in more complicated cases when an examining physician calls upon training and experience to offer a differential diagnosis (a determination of which of two or more diseases, presenting with similar symptoms, has caused a patient's ailments), most courts have found no *Daubert* problem.

*Feliciano-Hill*, 439 F.3d at 25. This case tracks *Feliciano-Hill*. Here, the causation testimony from each medical provider does not involve any "novel medical theories" but resulted from "routine diagnosis, on a patient he had examined, pertaining to a common condition well within his particular expertise." *Id.*; *see also Roney v. Wendy's Old Fashioned Hamburgers of New York, Inc.*, No. 2:05-CV-109-GZS, 2006 U.S. Dist. LEXIS 11303 (D. Me. March 17, 2006).

Falcon relies upon *Woltersdorf v. Desrochers*, 436 F. Supp. 2d 211 (D. Me. 2006), a recent decision by Judge Carter of this Court. Upon analysis, however, Judge Carter's opinion

---

[8] *Baker* cites *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 755 (3d Cir. 1994), which describes the technique as including inquiring of the patient the nature of her complaint, taking a history of the complaint, determining any other illnesses the patient might have, the patient's occupation and habits, outlining the possibilities, and then narrowing them down based on the doctor's experience.

supports the admissibility of the expert opinions in this case. In *Woltersdorf*, a plaintiff initiated a cause of action against the driver of a motor vehicle which rear-ended her. 436 F. Supp. 2d at 212. At issue was whether her post-accident injuries were causally connected to the motor vehicle accident. Ms. Woltersdorf alleged that she had sustained two different injuries as a result of the accident: a strain of the sternoclavicular joint and a left shoulder injury. Regarding the sternoclavicular joint injury, Ms. Woltersdorf presented evidence that after the accident she sustained pain in the joint and decreased strength in her left arm. *Id*. at 217. She also presented evidence of treatment from a variety of medical providers, including a physician's assistant. *Id*. at 213-14. Judge Carter found that Ms. Woltersdorf had established a causal connection between the accident and the sternoclavicular injury and he awarded damages related to that injury.

The left shoulder, however, was another matter. The motor vehicle accident occurred on June 2, 1999, but Ms. Woltersdorf's left shoulder symptoms did not begin until the fall of 2002. *Id*. at 219. Judge Carter was unconvinced that there was a causal connection between the 1999 accident and the 2002 symptoms and awarded no damages for that condition. In doing so, he rejected the treating surgeon's "conclusory, speculative, and unexplained testimony." *Id.* at 220.

Here, Mr. Akerson was involved in a motor vehicle accident and, within hours of the trauma, complained of pain, which continued and escalated in intensity over the next few days. His condition was confirmed by a physical examination by an emergency room physician five days after the accident, and was re-confirmed by a physical examination by a physician's assistant eleven days after the accident. The Plaintiff's evidence is similar to the facts underlying the sternoclavicular injury that Judge Carter found was related in *Woltersdorf*, not the left shoulder injury he found was not related.

13

The Plaintiff produced expert testimony from two qualified witnesses sufficiently based on their "knowledge, skill, experience, training, or education" to satisfy the requirements of Rule 702 and *Daubert*.

### D.  Motion for Summary Judgment

Falcon's motion for summary judgment is based exclusively on the premise that the Plaintiffs have not produced admissible expert testimony and that, since Ohio law requires such testimony, the Plaintiffs have failed to sustain their burden.[9]  Because the Court has concluded that the Plaintiffs have produced such evidence, Falcon's motion for summary judgment falls of its own weight.

## III.  CONCLUSION

The Court DENIES Defendant Falcon Transport Company's First Motion to Exclude Expert Testimony (Docket # 11) and its First Motion for Summary Judgment (Docket # 12).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 21st day of November, 2006

---

[9] Falcon's motion states:  "If the evidence submitted by Mr. Briggs and Dr. Harrigan regarding causation is excluded, Plaintiff is unable to meet his burden of proof and fails to generate a genuine issue of material fact that the subject accident caused his alleged injuries."  *Def.'s Mot. for Summ. J*. at 4 (Docket # 12).